**Thaddaeus Louis TURNER, Petitioner–Appellant,**

v.

**Arthur CALDERON, Warden, San Quentin State Prison; Jeanne Woodford, Warden, as Warden of San Quentin State Prison, Respondents–Appellees.**

No. 99–99019.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 14, 2001.

Filed Feb. 12, 2002.

Katherine L. Hart, Law Offices of Katherine Hart, Fresno, CA, for the petitioner-appellant.

Charles Trudrung Taylor, Lang, Richert & Patch, Fresno, CA for the petitioner-appellant.

Jeffrey D. Firestone, Deputy Attorney General, Sacramento, CA, for the respondents-appellees.

Before: WARDLAW, PAEZ, and TALLMAN, Circuit Judges.

## OPINION

WARDLAW, Circuit Judge.

In this capital case, Thaddaeus Louis Turner appeals the district court's denial of his petition for a Writ of Habeas Corpus. Seventeen years ago, Turner was convicted by a jury of first degree murder and robbery, and the special circumstance of robbery-murder was found to be true. He was sentenced to death on December 21, 1984. The California Supreme Court affirmed his conviction and sentence on April 26, 1990. Turner raises 21 claims in this habeas appeal, challenging both the guilt and penalty phases of his Merced County Superior Court trial.

There is no question that Turner killed his victim—he admitted as much—or that the circumstances reveal the seamy underside of life and death in a central California farming community. Nevertheless, there is a serious question as to whether

Turner would be on death row today had his counsel, who told the court he was unprepared to proceed with the penalty phase, adequately investigated and presented the available mitigating evidence. This is a question we cannot answer on this undeveloped record, however, because the district court erroneously denied Turner an evidentiary hearing on this point.

## I. Factual and Procedural History

We set out the facts as needed for our analysis. The California Supreme Court sets forth the facts in greater detail in its decision in *People v. Turner*. 50 Cal.3d 668, 680–87, 268 Cal.Rptr. 706, 789 P.2d 887 (1990). Thanages Turner was imprisoned from June 1982 to September 1983 after pleading guilty to possession of stolen property. Upon his release from prison, he lived with his mother and younger sister and worked as a carpenter helper and laborer for Cross Construction earning eight to nine dollars per hour. Because he did not have a car, Turner usually rode the bus to work. While waiting at a bus stop one day, Turner met Roy Savage, who offered him a ride. During their two-mile ride together, Turner described his carpentry work, and Savage offered Turner a job doing yard work. Savage called Turner the next week and the men agreed that Savage would pick up Turner at his home, fifty miles away, at 6:30 a.m. on Saturday, April 14, 1982.

When Savage arrived that morning, Turner was already "pretty gone," having smoked half a "sherm," a marijuana cigarette laced with phencyclidine ("P.C.P."). Though ostensibly brought to Savage's home to work, Turner spent much of the day doing other things with Savage—touring the house and accompanying Savage to a store, as well as talking, lunching, drinking, listening to music, and buying clothes with Savage. In addition, at some point,

Turner smoked the second half of his "sherm."

Turner subsequently attacked and killed Savage, stabbing him forty-four to forty-six times. The jury heard Turner's version of the events—that Savage sexually propositioned Turner prior to the attack and that Turner acted in response to the unwanted homosexual advances—and rejected it.

On Monday, April 16, 1984, Savage's second cousin Gregory Mayo, who often performed maintenance on Savage's rental houses and helped him with yard work, arrived at Savage's home to finish the yard work he had begun on April 13. He discovered Savage's body. He also noticed that Savage's Cadillac was missing. Mayo searched the house and observed that other items were missing, including two stereo sets, a tape cassette player, miniature speakers, wall statues, and clothing. He called the police.

Upon arriving at the scene, the police discovered that the telephone cords in the family room and upstairs bedroom were cut, but that there was no blood on them. The partially hidden telephone in the kitchen had not been disabled. The officers found Savage's body on the patio, lying face down, covered neatly by two towels and perhaps a sheet. Savage's head was resting on a pillow. Savage was fully clothed—his clothing had not been disturbed—and he had suffered multiple stab wounds. The rings he customarily wore were missing, but were later discovered under a rug near Savage's body. The thumb and finger were nearly severed off the hand where Savage normally wore his rings.

Pathologist Malcolm Murdoch was called to the scene to examine Savage's body and to determine the time and cause of death. Dr. Murdoch determined that Savage had multiple stab and "defense wounds." Dr.

Murdoch defined "defense wounds" as "wounds on [the victims'] hands from trying to protect themselves from being struck" by "a knife, a sharp edged weapon or blunt weapon, for that matter." The defense wounds were particularly evident on his right hand, where there was "a characteristic cut, a deep cut here between the thumb and the other forefingers, where you would cut yourself, you try to grab a knife or a knife hand." At the crime scene, Murdoch informed the investigating officer that he believed Savage had been stabbed with a buck knife because of the width and the depth of the stab wounds. Murdoch estimated at that time that Savage had been dead between twenty-four and forty-eight hours.

Later on Monday, April 16, two California Highway Patrol officers investigated a Cadillac that was creating a traffic hazard on Ventura Boulevard in Fresno. Turner, who had been outside the car when officers first approached, got into the Cadillac and drove off. After learning that the Cadillac had been reported stolen, the officers gave chase and followed Turner through a red light. Turner pulled over after the officers activated their siren. While handcuffing Turner, Officer Spence found a buck knife in a scabbard on the right side of Turner's belt. By this time, the radio dispatcher had informed the officers that the vehicle was possibly involved in a Merced murder.

The Cadillac was towed and searched pursuant to a warrant. A television from Savage's bedroom was found in the trunk, and the victim's wallet was found in the glove compartment. Blood was also found in the Cadillac's trunk, on the front seat, on the stolen television, on a piece of paper found in the car, on Turner's buck knife, and on the athletic shoes Turner was wearing at the time of his arrest. The blood samples taken from the television and knife were consistent with Savage's

blood and inconsistent with Turner's. Upon arrest, Turner had only small scratches on his arms. He did not have any self-defense wounds or injuries.

Turner was charged with murder and with the special circumstance of killing in the commission or attempted commission of robbery. The information also alleged that Turner had been convicted of receiving stolen property on October 6, 1982, and had served a prison term. An amended information added the charge of robbery. After an eleven-day trial, on November 21, 1984, Turner was found guilty of first degree murder and the special circumstance of robbery-murder. On November 27, 1984, Turner was found guilty of robbery, the delay resulting from a miscommunication between the judge and jury over the completion of the verdict forms.

The California Supreme Court affirmed the judgment in its entirety on April 26, 1990. *People v. Turner*, 50 Cal.3d 668, 268 Cal.Rptr. 706, 789 P.2d 887 (1990). The petition for rehearing was denied on June 21, 1990. *People v. Turner*, No. S004658, 1990 Cal. LEXIS 2616 (Jun. 21, 1990). The United States Supreme Court denied *certiorari* on January 14, 1991. *Turner v. California*, 498 U.S. 1053, 111 S.Ct. 768, 112 L.Ed.2d 787 (1991).

## II. Jurisdiction and Standard of Review

As a preliminary matter, because the Anti Terrorism and Effective Death Penalty Act ("AEDPA") governs Turner's right to appeal, we grant a certificate of appealability, pursuant to 28 U.S.C. § 2253, with respect to eight of Turner's claims and deny issuance as to the remainder. We affirm the district court's denial of the writ as to seven claims, and reverse and remand for an evidentiary hearing on Turner's claim of ineffective assistance of counsel at the penalty phase of his trial.

■ The district court had jurisdiction to entertain Turner's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. We have jurisdiction to hear Turner's appeal from the district court's denial of his petition pursuant to 28 U.S.C. § 2253. We review the denial *de novo*. *Bonin v. Calderon*, 59 F.3d 815, 823 (9th Cir.1995). The district court's findings of fact, however, are reviewed for clear error. *Id.* "Because of the limited scope of habeas corpus review, trial errors do not warrant relief unless the errors 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at 823–24 (citation omitted).

Turner filed his first petition, *pro se*, on April 1, 1991, his first amended petition on March 8, 1993, and his second amended petition on April 29, 1996. On April 1, 1991, Turner filed a Petition for a Writ of Habeas Corpus *pro se* in the United States District Court for the Eastern District of California, requesting a stay of execution until counsel was appointed. District Judge Robert Coyle stayed the execution, and on March 8, 1993, Turner filed a First Amended Petition for Writ of Habeas Corpus. Because not all of the claims were exhausted in state court, on May 25, 1993, Judge Coyle ordered Turner's attorneys to file a state habeas petition. The district court held the proceedings in abeyance and continued the stay of execution. Turner then filed a Petition for a Writ of Habeas Corpus in the California Supreme Court, which was denied in its entirety on March 20, 1995.

On April 29, 1996, Turner filed his Second Amended Petition for a Writ of Habeas Corpus, asserting 37 claims for relief. Judge Coyle denied each of Turner's claims on the merits in four separate decisions, dated April 29, 1997; September 23, 1997; April 27, 1999(in which Judge Coyle also denied Turner's motion for an eviden-

tiary hearing); and May 18, 1999. Judge Coyle granted neither a certificate of probable cause nor a certificate of appealability because Ninth Circuit law at that time was unclear as to which was required if the petitioner's writ was filed in district court before AEDPA was enacted, but appealed after that date. On May 18, 1999, the Clerk of the United States District Court for the Eastern District of California issued the judgment of the court denying the Petition for a Writ of Habeas Corpus.

■ Turner timely filed a notice of appeal on May 28, 1999. We treated the notice of appeal as a request for a certificate of probable cause or appealability. Turner filed a request for a certificate of probable cause or appealability on June 28, 1999. We granted a certificate of probable cause on August 8, 1999, under the later-deemed erroneous impression that a certificate of appealability was not required for cases filed before AEDPA's enactment. Because Turner's habeas action commenced before the enactment of AEDPA, the district court found that the revisions to Chapter 153, as amended by AEDPA, did not apply. While AEDPA does not apply to Turner's substantive arguments, it does, however, apply to his right to appeal, notice of which was filed May 28, 1999—well after April 24, 1996, the effective date of AEDPA. *Slack v. McDaniel*, 529 U.S. 473, 481–82, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Turner's notice of appeal was timely as the judgment below was entered on May 18, 1999.

■ We must "construe [Turner's] notice of appeal as a request for a certificate of appealability, and issue the certificate of appealability as to the issues that satisfy the standard for issuance." *Sassounian v. Roe*, 230 F.3d 1097, 1100(9th Cir.2000). AEDPA authorizes a certificate of appealability " 'if the applicant has made a substantial showing of the denial of a constitu-

tional right.'" *Id.* (quoting 28 U.S.C. § 2253(c)(2)). A "substantial showing ... includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack,* 529 U.S. at 484, 120 S.Ct. 1595 (internal quotations omitted); *see also Sassounian,* 230 F.3d at 1101. Thus, "[w]here a district court has rejected the constitutional claims on the merits, ... [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack,* 529 U.S. at 484, 120 S.Ct. 1595.

## III. Discussion

### A. Claims that do not Warrant a Certificate of Appealability

Turner fails to make a substantial showing of the denial of a constitutional right as to claims five, six, seven, eight, nine, ten, twelve, thirteen, sixteen, seventeen, eighteen, nineteen, and twenty.

### 1. Ineffective Assistance—Failure to Request a Change of Venue (Claim Nineteen).

██ Turner argues that his Sixth Amendment right to an impartial jury was violated when his trial counsel failed to move for a change of venue from Merced County, California. Although he asserts that his trial generated "extensive publicity," he offers no evidence to support this assertion and concedes that he did not develop a full factual basis for this claim in the district court. The district court denied Turner's motion for an evidentiary hearing and/or discovery to substantiate this allegation, finding that the claim "lack[ed] merit in that it [was] totally unsubstantiated."

██ We agree. Due process requires that the trial court grant a defendant's motion for a change of venue when the trial court is unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere. *Harris v. Pulley,* 885 F.2d 1354, 1361 (9th Cir.1988). We require a petitioner to show that prejudice should be presumed or that actual prejudice existed. *Hart v. Stagner,* 935 F.2d 1007, 1014 (9th Cir.1991). Turner has not established the prerequisite for an analysis of prejudice—that there was some cause for requesting a change of venue (*i.e.,* pre-trial publicity)—and thus we decline to issue a certificate of appealability on this claim.

### 2. Jury Instruction Regarding Willfully False Witnesses (Claim Six).

Turner argues that the district court erred by giving the willfully false witness instruction pursuant to CALJIC 2.21.2, which provides:

A witness willfully false in one material part of his testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you shall believe the probability of truth favors his testimony in other particulars.

Turner contends that this instruction violated his right to due process of law because, as he was one of only "a handful of lay witnesses," it "pinpointed Turner's testimony for adverse scrutiny thereby prejudicing his entire defense." Turner also argues that "there was no evidentiary basis for the instruction."

██ We decline to grant a certificate of appealability on this claim. No reasonable jurist could conclude that, viewed in context, this "instruction by itself so infected the entire trial that the resulting convic-

tion violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). The petitioner must establish that " 'there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).

When viewed in the context of the instructions as a whole, the willfully false witness instruction did not render Turner's conviction constitutionally invalid. The instruction applied to all witnesses, and did not single out Turner. The jury was given a nonexclusive list of factors to consider in determining the truthfulness of the witnesses and was admonished not to disbelieve the testimony of a particular witness simply because it contradicted the testimony of another. Moreover, there was an evidentiary basis for the instruction because Turner's out-of-court statements to Officer Strength that he did not know Savage and had never been to Merced were contradicted by his own in-court testimony.

Moreover, the text of the willfully false witness instruction itself undermines Turner's argument. It specifically instructs the jury that "you may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you shall believe the probability of truth favors his testimony in other particulars," thereby informing the jury that it may choose to believe some of the testimony of a witness it finds to be willfully false. Thus, because the jury "remained free to exercise its collective judgment to reject what it did not find trustworthy or plausible," the instruction could not be applied in a way

that challenged the Constitution. *Cupp*, 414 U.S. at 149, 94 S.Ct. 396.

3. Jury Instruction Regarding Sufficiency of Testimony of One Witness (Claim 7).

■ Similarly, we do not believe that the "testimony by one witness" instruction, given in accordance with CALJIC 2.27 (1977 Revision), "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72, 112 S.Ct. 475 (quoting *Cupp*, 414 U.S. at 147, 94 S.Ct. 396). The district court correctly found that the single witness instruction did not prejudice the defendant. At the time of Turner's trial, the language of CALJIC 2.27 provided:

Testimony which you believe given by one witness is sufficient for the proof of any fact. However, before finding any fact to be proven solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends.

Like the willfully false witness instruction, the single witness instruction applied to all witnesses and did not single out Turner. Nor did the instruction lessen the government's burden of proof by encouraging the jury to carefully scrutinize Turner's testimony as the only evidence of his intent to rob.

Turner was not the only source of evidence supporting the jury's conclusion regarding intent. The State relied heavily on evidence that the telephone cords had been cut. The absence of blood on the cords supports the State's theory that Turner planned to steal from Savage before the violence erupted. The trial court repeatedly instructed the jury regarding its duty to find each of the elements of the offenses, including the elements of the robbery special circumstances, beyond a reasonable doubt. The single witness in-

struction, given only once, could not have lessened the government's burden of proof. Considering the single witness instruction in the context of the instructions as a whole, no reasonable jury could have applied CALJIC 2.27 in a way that violates the Constitution.

4. *Sua Sponte* Instruction on Evidence of a Mental Disease (Claim Thirteen).

 Turner claims that the trial court erred by failing to give CALJIC 3.32 (formerly CALJIC 3.36) *sua sponte* and that this error deprived him of a potentially meritorious defense at both the guilt and penalty phases of his trial. At the time of Turner's trial, CALJIC 3.32 provided:

Evidence has been received regarding a[mental disease] [mental defect] or [mental disorder] of defendant [___] at the time of the offense charged [in Count [___]]. You may consider such evidence solely for the purpose of determining whether or not the defendant [___] actually formed the mental state which is an element of the crime charged [in Count [___]] to-wit ___.

Turner asserts this error was particularly prejudicial because his entire defense was premised on a diminished mental state that mitigated the crime.

We agree with the district court's conclusion, based on its careful review of the evidence and the instructions as a whole, that Turner was not prejudiced by the failure of the trial court to *sua sponte* issue the instruction either at the guilt or penalty phase.

5. Inadequate Notice of Prosecution's Penalty Phase Evidence (Claim Nine).

 Turner argues that the State's violation of California Penal Code § 190.3, which requires the prosecution to give defendants notice of new evidence to be introduced at the penalty phase, also violat-

ed his Eighth and Fourteenth Amendment rights. To the extent that Turner is claiming a violation of the California Penal Code, a certificate of appealability cannot issue. *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Sassounian*, 230 F.3d at 1100 ("Such certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right, and must indicate which specific issue or issues satisfy the showing.") (citations and internal quotations omitted). To the extent that Turner is attempting to bootstrap his Section 190.3 claim into a supposed constitutional violation, a certificate of appealability should not issue.

 Turner argues that although the State provided him with a list of guilt phase witnesses, it did not do the same for the penalty phase. As a result, Turner had no notice that Dr. Murdoch, the autopsy surgeon, would be recalled or that the State would introduce photographs of the depth of the victim's wounds. We agree with the district court, however, that although Turner had a right to notice of the charges pending against him, he did not have "a constitutional right to notice of the evidence which the state plan[ned] to use to prove those charges." The Supreme Court has rejected a similar argument:

A defendant's right to notice of the charges against him which he must defend is well established. But a defendant's claim that he has a right to notice of the *evidence* that the state plans to use to prove the charges stands on quite a different footing. We have said that the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded. In *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), we considered

the due process claim of a defendant who had been convicted with the aid of surprise testimony of an accomplice who was an undercover agent. Although the prosecutor had not intended to introduce the agent's testimony, he changed his mind the day of trial. To keep his cover, the agent had told the defendant and his counsel that he would not testify against the defendant. We rejected the defendant's claim, explaining that [t]here is no general constitutional right to discovery in a criminal case, and *Brady*, which addressed only exculpatory evidence, did not create one. To put it mildly, these cases do not compel a court to order the prosecutor to disclose his evidence; their import, in fact, is strongly against the validity of petitioner's claim.

*Gray v. Netherland*, 518 U.S. 152, 167–68, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) (citations and internal quotations omitted) (alteration in original).

Moreover, to decide that Turner had such a right would require the creation of a new rule of law under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), which could not be used as a ground for relief in this collateral proceeding. We therefore decline to grant a certificate of appealability on this issue.

6. Prosecutorial Misconduct in Penalty Phase Closing Argument (Claim Twelve).

We also reject Turner's claim that the prosecutor engaged in misconduct during closing argument by (1) misleading the jury into believing that a death verdict was obvious through advocacy for a mechanical application of the mitigating and aggravating factors; (2) converting the absence of a mitigating factor into an aggravating factor; and (3) knowingly making false statements. To the extent the prosecutor engaged in improper argument, an issue which we need not decide here, we do not believe that any reasonable jurist could find that it "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Sandoval v. Calderon*, 241 F.3d 765, 778 (9th Cir.2000) (citation omitted) (alteration in original), *cert. denied*, —— U.S. ——, 122 S.Ct. 112, 151 L.Ed.2d 69 (2001), *and cert. denied*, —— U.S. ——, 122 S.Ct. 322, 151 L.Ed.2d 241 (2001).

 "We examine the likely effect of the statements in the context in which they were made," *id.* at 778, to determine "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "Improper comment warrants reversal only if it appears that the comment may possibly have affected the verdict." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir.1987) (citation omitted).

 With respect to Turner's first allegation, the prosecutor's isolated comments about the obviousness of the death penalty did not violate the well-established constitutional rule that the penalty of death must be based on an individualized consideration of all the relevant aggravating and mitigating factors. *See Lockett v. Ohio*, 438 U.S. 586, 606, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The prosecutor stated: "And in one of your instructions there, it's listed, those factor[s] are listed one by one. You're to weigh them, and if one, if the aggravating outweighs the mitigating, then the decision's obvious. Otherwise it's obvious the other direction[ ]."

Before making these challenged statements, the prosecutor reminded the jury of

its duty to weigh the aggravating circumstances against the mitigating circumstances. Mirroring the language of Section 190.3, he argued that "if you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose the sentence of death. However, if you determine that the mitigating circumstances out-weigh the aggravating circumstances, you shall impose a sentence of confinement in state prison for life without possibility of parole."

Defense counsel reiterated the jury's responsibilities in closing argument:

You will note in the instructions that various factors have to be proved beyond a reasonable doubt. When it comes down to judging those factors, balancing those factors, the law's quite vague in my opinion.

The critical term is outweighed. Does aggravation outweigh mitigation. And I think the law fails to give you much definition at this point. I think a lot is left up to you.

There is no reference to a neutral determination that these factors balance one another. There is no instruction to you what to do, if they balance. The term is outweighed.

The defense also emphasized the importance of conducting the weighing process and the seriousness of the impending life or death decision, asking the jury whether "the evidence [is] so clear in this case of aggravating factors that the aggravating factors outweigh the mitigating factors that we—I'm part of this procedure as much as you—that we should presume the power of ending another person's life." Finally, to clarify the jury's role one last time after the closing arguments, the trial court, pursuant to Section 190.3, instructed the jury:

If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death.

However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without possibility of parole.

Thus, the jury was informed of its responsibility to weigh the aggravating and mitigating circumstances, of its duty to determine the weight each factor received, and of the difficulty of making the determination. Therefore, the prosecutor's "obviousness" argument did not make the jury's determination that death should be imposed a foregone conclusion.

■ With respect to Turner's second allegation, we agree with the California Supreme Court that, although the prosecutor erred by arguing that the absence of mitigating factors could be considered an aggravating factor, that error was not prejudicial. That Court held that, despite the prosecutor's argument, "the jurors were not misled about their discretion and responsibility to determine the appropriate penalty under all the evidence." *Turner,* 50 Cal.3d at 714, 268 Cal.Rptr. 706, 789 P.2d 887. Assuming that reasonable jurors understood how to evaluate the absence of mitigating factors, the Court concluded that "[s]uch jurors are unlikely to give substantial aggravating weight to the absence of obviously mitigating factors." *Id.* Given the particularly savage nature of this murder and the few mitigating factors presented by Turner, the Court determined that there was an "overwhelming balance of valid aggravating evidence" and therefore "no reasonable possibility [that] the prosecutor's mischaracterizations affected the penalty verdict." *Id.*

Nor did the prosecutor create an aggravating factor not provided for in Section

190.3 and invite the jury to consider it. Rather, he mischaracterized a potentially mitigating factor as an aggravating factor when reviewing the evidence for the jury.

The transcript reveals that both the prosecution and the defense reminded the jury that it had to find that the aggravating factors outweighed the mitigating factors before a sentence of death could be imposed, and both sides emphasized the importance of the weighing process. That the prosecutor characterized one statutory factor as aggravating, as opposed to mitigating, when the statute itself makes no such distinction, did not render the proceedings so unfair "as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181, 106 S.Ct. 2464 (citation omitted).

 Nor do we agree with Turner's allegation that the prosecutor knowingly made a false statement when he said "we can't tell" whether drugs were in Turner's system at the time of the killing. Other than Turner's own testimony, which the jury was free to disbelieve, there is no evidence in the record that Turner smoked P.C.P. or drank brandy on the day of the murder. Thus, the prosecutor's statements that "we don't know" whether Turner was intoxicated and that "we can't tell" whether drugs were in Turner's system at the time of the murder were accurate, as was his statement that because Turner was apprehended two days after the murder, a blood test run at the time of his arrest would not indicate whether there were drugs in his system on the day of the murder.

The prosecutor never stated that Turner was not intoxicated, but argued that, given the evidence in the record, the jury could not know for sure. Because the contested statements were not false, we conclude that they could not have "so infect[ ] the trial with unfairness as to make the result-

ing conviction a denial of due process." *Id.*

7. Combination of Prosecutorial Misconduct and Faulty Instructions (Claim Eight).

Turner argues that the combination of prosecutorial misconduct discussed above, and the trial court's instruction that the jury "shall impose a sentence of death" if it concluded "that the aggravating factors outweigh the mitigating factors," discussed below, precluded the jury from making the individualized sentencing determination required by *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). We decline to issue a certificate of appealability on the claimed prosecutorial misconduct because the alleged prosecutorial errors—individually or in combination—did not "so infected the entire trial that the resulting conviction violate[d] due process," *Estelle,* 502 U.S. at 72, 112 S.Ct. 475 (quoting *Cupp,* 414 U.S. at 147, 94 S.Ct. 396). Because the allegations of prosecutorial misconduct add nothing to the claimed instructional error, which we consider separately, we decline to issue a certificate of appealability for the combined claim eight.

8. Failure to Instruct the Jury that the Weighing of Aggravating and Mitigating Factors Was Not a Mechanical Process (Claim Seventeen).

 Turner asserts that the trial court should have instructed the jury that the weighing of aggravating and mitigating factors was not a mechanical process. As the district court noted, this claim echoes those previously raised and addressed. And, in a similar vein, a certificate of appealability is not warranted here because "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required," *Zant v.*

*Stephens*, 462 U.S. 862, 875 n. 13, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), as long as the jury does not engage in a mechanical weighing of aggravating and mitigating factors, which would prevent an individualized consideration of mitigating factors required by *Lockett*.

9. Improper Consideration of Non–Statutory Aggravating Circumstances (Claim Ten).

Turner argues that the trial court violated California Penal Code § 190.4 by considering non-statutory aggravating factors and failing to consider mitigating factors when reviewing Turner's automatic application for modification of the death verdict. He contends that his Fifth, Eighth, and Fourteenth Amendment rights were violated. Because Turner provides no legal authority to support his constitutional claim, and because the trial court made an individualized determination of whether death was the proper punishment, we agree with the district court that "at most the [trial court's] error would be one of state law." We therefore deny the certificate of appealability. *See Pulley*, 465 U.S. at 41, 104 S.Ct. 871("A federal court may not issue the writ on the basis of a perceived error of state law.").

10. Disproportionality of the Death Sentence (Claim Eighteen).

We also decline to issue a certificate of appealability on Turner's claim that imposition of the death penalty in this case is grossly out of proportion to the severity of his crime, and thus constitutes cruel and unusual punishment, in violation of the Eighth Amendment, on the grounds that the jury made no specific finding of an intent to kill and the intent to rob was doubtful. As the district court noted, this claim is a dressed-up challenge to the sufficiency of the evidence for the conviction.

Turner provides no legal authority to support his assertion that his penalty is disproportionate to his crime. And, in fact, there was sufficient evidence from which the jury could have found that Turner intended to steal from and kill Savage. That the jury was not required to make a specific finding that Turner intended to kill Savage, but instead could have relied on felony murder, does not render the death sentence disproportionate. *See, e.g., Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (holding that death is not a disproportionate penalty for a defendant convicted under the felony murder statute where the defendant demonstrated a reckless indifference to the value of human life and who was a major participant in the felony committed). Because Turner fails to provide either legal or factual support for his disproportionality claim, he has not " 'made a substantial showing of the denial of a constitutional right.' " *Sassounian*, 230 F.3d at 1100(quoting 28 U.S.C. § 2253(c)(2)).

11. The Constitutionality of the California Death Penalty Statute (Claim Sixteen).

Turner argues that the 1978 California death penalty statute is unconstitutionally vague because it fails to provide guidance concerning the weighing process for the aggravating and mitigating circumstances. This issue has not been subject to reasonable debate since 1990 when the Supreme Court decided *Boyde v. California*. 494 U.S. 370, 377, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (upholding the "shall impose" language in California's death penalty statute). Moreover, "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required," *Zant*, 462 U.S. at 875 n. 13, 103 S.Ct. 2733 (1983), as long as the death penalty statute adequately

channels the jury's sentencing discretion. *Id.* at 877, 103 S.Ct. 2733.

12. Ineffective Assistance of Appellate Counsel (Claim Five).

 Turner argues that appellate counsel was deficient because he did not raise on direct appeal trial counsel's failure to corroborate with physical or anecdotal evidence Turner's claim 2457 that he was under the influence of P.C.P. at the time of the offense. In his view, this perpetuated the ineffectiveness of trial counsel. Claims of ineffective assistance of appellate counsel are reviewed according to the standard announced in *Strickland v. Washington,* 466 U.S. 668, 687–90, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (requiring counsel's performance to be both deficient and prejudicial). To be constitutionally effective, " '[c]ounsel need not appeal every possible question of law....' " *Gustave v. United States,* 627 F.2d 901, 906 (9th Cir.1980).

 As we discuss below, trial counsel's failure to test the P.C.P. content of blood samples taken six days after the offense and four days after Turner's arrest did not constitute ineffective assistance of counsel because the jury could have attributed P.C.P. content to Turner's admitted post-offense use. Thus, there can be no debate that the district court was correct in concluding that appellate counsel was not ineffective for failing to raise this meritless claim or that this failure compounded trial counsel's original error. A failure to raise untenable issues on appeal does not fall below the *Strickland* standard. *Featherstone v. Estelle,* 948 F.2d 1497, 1507(9th Cir.1991) (Where "trial counsel's performance, although not error-free, did not fall below the *Strickland* standard[,] ... petitioner was not prejudiced by appellate counsel's decision not to raise issues that had no merit."); *Gustave,* 627 F.2d at 906

("There is no requirement that an attorney appeal issues that are clearly untenable.").

13. Newly Discovered Evidence (Claim Twenty).

 Turner also fails to satisfy the threshold requirements for consideration of a newly discovered evidence claim. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("[F]ederal habeas courts sit to ensure 2458 that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact.").

The one exception is when a defendant introduces affirmative proof of actual innocence based on newly discovered evidence. As we stated in *Carriger v. Stewart,* 132 F.3d 463(9th Cir.1997) (en banc):

We conclude that the *Herrera* majority's statement that the threshold for a freestanding claim of innocence would have to be 'extraordinarily high' contemplates a stronger showing than insufficiency of the evidence to convict. We therefore decline to adopt the modified *Jackson* standard. We believe that the required showing would have had to be at least as high as the more demanding standard articulated by Justice Blackmun in his *Herrera* dissent. Justice Blackmun stated that to be entitled to relief, a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.

Requiring affirmative proof of innocence is appropriate, because when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled

to relief despite a constitutionally valid conviction.

*Id.* at 476 (citations omitted).

Turner neither alleges an independent constitutional violation nor presents affirmative proof of his innocence. In fact, he argues only that the newly discovered evidence casts doubt on whether he had the requisite mental state for first degree murder—not that the evidence conclusively established he did not have the requisite mental state. The blood sample taken six days after the homicide, during which time Turner admittedly used P.C.P., cannot do so. Thus, Turner is not entitled to a certificate of appealability on this issue.

B. Claims that Warrant a Certificate of Appealability

Turner satisfies the standard for issuance of a certificate of appealability as to claims one, two, three, four, eleven, fourteen, fifteen, and twenty-one. Because consideration of whether a certificate of appealability should issue necessarily requires a discussion of the merits of each claim, we analyze each in turn.

1. Ineffective Assistance of Counsel at the Guilt Phase (Claim Three).

 Turner presents sixteen specific examples of alleged deficient and prejudicial performance by his trial counsel during the guilt phase. To demonstrate that counsel was ineffective, Turner must show that (1) counsel's actions were deficient; and (2) counsel's deficiency prejudiced him. *Strickland*, 466 U.S. at 687–90, 104 S.Ct. 2052. To be considered deficient, counsel's performance must fall "below an objective standard of reasonablness" as established by the prevailing professional norms existing at the time of his representation. *Id.* at 688, 104 S.Ct. 2052. Counsel's actions are not to be viewed through "the distorting lens of hindsight." *Hendricks v. Cal-*

*deron,* 70 F.3d 1032, 1036(9th Cir.1995) (citation omitted). "Although there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and judicial scrutiny of counsel's performance must be highly deferential, counsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client." *Sanders v. Ratelle,* 21 F.3d 1446, 1456 (9th Cir.1994) (internal citations and quotations omitted).

 We have held that counsel's performance is deficient if he fails to either conduct a reasonable investigation or provide strategic reasons for not doing so. *Id.* Deficient performance alone, however, is not enough to render counsel's representation constitutionally ineffective. Turner must also establish prejudice, by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Thus, to succeed in this claim, Turner must show (1) that counsel's actions were deficient, according to "an objective standard of reasonableness" as established by the prevailing professional norms extant during his representation, and (2) that counsel's deficiency prejudiced him. *Id.* at 687–90, 104 S.Ct. 2052. To establish prejudice at the guilt phase, Turner must show "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. 2052.

District Judge Coyle's categorization of Turner's examples of ineffective assistance is helpful to our analysis:

 a) undeveloped and unpresented evidence of Turner's narcotic use;

b) undeveloped and unpresented evidence of Turner's abusive childhood and family problems;

c) the absence of corroboration and explanation for Turner's account that the stabbing followed Mr. Savage's unwanted sexual advances;

d) trial counsel's failure to aggressively represent Turner's interests at trial; and

e) trial counsel's failure to encourage Turner to accept the prosecution's plea offer of second degree murder.

a. Turner's Narcotics Use.

Turner argues that the most egregious display of constitutionally infirm representation was the failure of trial counsel, Mr. Ellery, to arrange for the testing of blood samples, which had been drawn from Turner after his arrest. The samples, drawn six days after the homicide and four days after the arrest, had been tested for blood type and compared to samples taken from Turner's buck knife. Turner contends that the blood samples would have supplied physical evidence corroborative of his trial testimony about his extensive drug use. It cannot be the case that Mr. Ellery told habeas counsel that he was unaware that Petitioner's blood sample had been submitted as an exhibit at trial, as the blood samples were discussed during the preliminary hearing. In fact, Mr. Ellery cross-examined the lab employee who performed the blood analysis.

According to Dr. Stephen Pittel, a professor of psychology and forensic consultant engaged by habeas counsel, when the blood sample was tested by habeas counsel, it contained .44 mg/L of P.C.P., whereas the level considered necessary to produce an "acute confusional state" is .01 to .10 mg/L. Ernest Lykissa, a forensic toxicologist, confirmed both that there was .44 mg/L of P.C.P. in the blood and that .10 mg/L is the level where P.C.P. becomes toxic. According to Dr. Pittel, given the slow pace of P.C.P. excretion from the body, the level of P.C.P. found in Turner's blood was consistent with his reported use of P.C.P. on the day of the homicide. The State's post-conviction P.C.P. blood level test showed an approximate concentration level of .20 mg/L, less than half of that found by the defense experts but still twice the toxicity level.

In addition to failing to obtain this supposedly corroborative evidence of P.C.P. use, Turner argues that Mr. Ellery failed to hire a competent expert to testify as to the effects of P.C.P. on perceptual and motor abilities, the after-effects of P.C.P., the synergistic effect of the use of P.C.P. and other mind-altering drugs, and the distorted perceptual responses to perceived provocations while under the influence of P.C.P. According to Dr. Pittel, "the use of these substances may have exacerbated [Turner's] emotional reaction to actual homosexual advances made by the victim or caused him to misconstrue the victim's behavior as a homosexual advance." Furthermore, Turner's "chronic abuse of P.C.P. and alcohol may have significantly impaired Mr. Turner's ability to think clearly, to exercise appropriate judgment and to conform his behavior to the requirements of law."

In addition, Turner offers the declaration of Dr. Howard Terrell, who opines that Mr. Ellery should also have introduced the extensive documentation within established medical literature demonstrating the propensity of P.C.P. and other drugs to cause severe behavioral changes, relevant to Turner's case where the "major issue . . . is the effect on Petitioner's mind of the ingestion of P.C.P., alcohol, marijuana, and methamphetamine."

Turner further argues that Mr. Ellery was ineffective for "failing to interview family members and friends about Tur-

ner's history of drug use in general and P.C.P. use in particular during the six months preceding the day of the offense," and that "court records were not consulted to verify Turner's long history of drug abuse."

■ Although the district court agreed with Turner that "evidence of mental health professionals, with expertise in the area of P.C.P." would have shed light on "the clinical effects of P.C.P. intoxication, including, exaggerated emotional reactions to external stimuli (possibly manifested as homophobia in this instance), irrational behavior, as noted by Dr. Pittel, and distortion of reality, paranoia, and violent behavior, as noted by Dr. Terrell," it concluded:

The significance of this empirical evidence, however, is completely obliterated by Turner's admission to the probation officer that he used P.C.P. *on the day of his arrest*.... Failure of Mr. Ellery to present evidence of Turner's high blood P.C.P. test results cannot be determined incompetent. Given the stress one would anticipate Turner experienced following his violent killing of Mr. Savage, together with his admitted history of heavy P.C.P. use, the jury reasonably would have attributed Turner's highblood P.C.P. level 6 days after the offense, at least in part, to post-offense use and not solely to pre-offense use....

Based on Turner's trial testimony, the prejudice prong is also quite tenuous. That Turner recounted the sequence of events and details leading up to the fatal encounter, tilts the scales away from a prejudice finding. Rather, his recall of the events is consistent with control of his mental faculties ... Turner's alleged P.C.P. intoxication, even as could be substantiated by his experts and notwithstanding his post-crime admission of

P.C.P. use, would not have made a difference to the outcome of the trial.

We, like the district court, are not persuaded that any of these asserted deficiencies render Mr. Ellery's representation constitutionally ineffective, particularly given the "strong presumption" of competency due trial counsel. *Smith v. Ylst,* 826 F.2d 872, 875 (9th Cir.1987). With respect to testing samples of Turner's blood taken for P.C.P. levels six days after the homicide, Mr. Ellery may have reasonably concluded that a jury would attribute the P.C.P. blood content to the post-offense use to which Turner admitted, particularly when no evidence, other than Turner's own testimony, established that he used P.C.P. on the day in question. Thus, we conclude that Mr. Ellery was not constitutionally ineffective for failing to test the blood sample for P.C.P. levels.

■ For similar reasons, we also reject Turner's claim that Mr. Ellery was ineffective for failing to interview Turner's family and friends about his alleged P.C.P. use. None of the witnesses could corroborate Turner's P.C.P. use on the day in question—they could only speak to his past usage. Because Turner himself testified to extensive prior drug use, similar family and friend testimony would have been cumulative. Therefore, Mr. Ellery was not constitutionally ineffective at the guilt phase for failing to interview Turner's family and friends regarding his drug abuse.

■ Nor do we believe that Mr. Ellery's failure to employ an expert to testify specifically about the effects of P.C.P. and other drugs was constitutionally ineffective. The expert he did employ, Dr. Phillip Hamm, testified as to the effects of Turner's P.C.P. use, stating that Turner's intoxication and drug use would have affected his ability to deal with stress, and Turner's below-average intellectual abilities would have rendered him even more

susceptible to the influence of drugs than a person of greater capabilities.

The gravamen of Turner's complaint is not that Dr. Hamm failed to testify about the likely effects of P.C.P. on Turner, but that because he was a general psychologist and not an expert on P.C.P. specifically, a more specialized expert would have been more persuasive. Such an argument, however, does not support a claim of ineffective assistance of counsel. The choice of what type of expert to use is one of trial strategy and deserves "a heavy measure of deference." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052(discussing particular decisions not to investigate). Mr. Ellery was entitled to rely on Dr. Hamm as his expert. Nothing in the record demonstrates that Dr. Hamm was unqualified to answer any questions regarding the effects of P.C.P. Mr. Ellery's reliance on Dr. Hamm, a "properly selected expert," was "within the wide range of professionally competent assistance." *Harris v. Vasquez,* 949 F.2d 1497, 1525 (9th Cir.1990) (internal quotations omitted).

In reviewing Mr. Ellery's reliance on Dr. Hamm, we must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Mr. Ellery cannot be deemed ineffective because, with the benefit of hindsight, we now determine that other trial strategies or expert witnesses may have been a better choice. *See id.* at 689–90, 104 S.Ct. 2052 ("Even the best criminal defense attorneys would not defend a particular client in the same way.") (citation omitted); *Campbell v. Wood,* 18 F.3d 662, 673 (9th Cir.1994) ("We will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight."). Thus, although a

P.C.P. expert may have produced stronger, more persuasive testimony, Mr. Ellery's employment of Dr. Hamm was not constitutionally ineffective.

b. Turner's Abusive Childhood and Family Problems.

Turner argues that Mr. Ellery was also constitutionally ineffective at the guilt phase for failing to conduct even a "cursory investigation" into his abusive childhood. Such an investigation would have revealed that, among other things, Turner came from an alcoholic household in which his father beat him on the head and forced Turner and his siblings to sit on a dangerous embankment next to an irrigation canal as punishment. It would also have revealed that Turner's father came from an alcoholic household. Turner argues that these facts should have been discovered and provided to Dr. Hamm in support of his claim of mental impairment at the time of the offense. Beyond his bare assertions of what should have been discovered, however, Turner does not explain how this evidence would have changed the outcome of the guilt phase.

The district court found that Mr. Ellery was not unreasonable in failing to develop a complete social history for Turner and his family, nor was he unreasonable in failing to provide Dr. Hamm with facts about his family. We agree.

Failure to provide a psychologist with facts about a defendant's family history ordinarily cannot support a claim of constitutionally ineffective assistance. As we have previously held, "[i]n the absence of a specific request, an attorney is not responsible for gathering background material that might be helpful to a psychiatrist evaluating his client." *Hendricks,* 70 F.3d at 1038 (internal quotations omitted). To impose such a duty "would defeat the

whole aim of having experts participate in the investigation." *Id.* at 1038. Here, there is no evidence indicating that Dr. Hamm requested evidence of Turner's family history or that he supplied Mr. Ellery with information suggesting the need for further investigation. Nor is there any evidence that Turner himself gave Mr. Ellery cause to believe investigation into his family history would have aided his guilt phase preparation. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").

We therefore affirm the district court's conclusion that Mr. Ellery was neither deficient nor ineffective in failing to further investigate Turner's background in the guilt phase. Because Turner does not indicate how such information would have changed the outcome of the jury's verdict at the guilt phase, we conclude that, had Mr. Ellery been deficient in failing to develop a complete social history on Turner's family, no prejudice resulted.

c. Unwanted Sexual Advances/Homosexual Overtones.

■■■ Turner also predicates his ineffective assistance argument on Mr. Ellery's failure to present corroborating evidence of Savage's homosexuality and predatory nature. Specifically, Turner alleges that Mr. Ellery performed deficiently by allowing a homosexual bar frequented by Savage to be portrayed as a bar where homosexuals just happened to gather; failing to establish that the semen in the tip of Savage's penis when his body was discovered was not merely coincidental; failing to show Savage's trips to San Francisco were for homosexual purposes; and failing to preserve matchbooks from homosexual establishments found in Savage's house. According to Turner, this evidence, combined with expert testimony that P.C.P. can exacerbate a fear of homosexual attack, would have led the jury to conclude that Turner did not intend to murder or rob Savage.

Turner submits several declarations as to the evidence he believes Mr. Ellery should have introduced to corroborate allegations of Savage's homosexuality. His argument, however, is "predicated upon showing what defense counsel could have presented, rather than upon whether counsel's actions were reasonable." *Babbitt v. Calderon,* 151 F.3d 1170, 1174 (9th Cir. 1998). Because many of the declarations relied upon by Turner were inadmissible, the district court found that "Turner has not presented a single witness who could corroborate, with competent evidence, his contention of Mr. Savage's sexual preference and predatory nature." It thus concluded that "the evidence proffered by Turner to establish what Mr. Ellery *could* have presented absolutely does not prove the contention of incompetent representation because it would have been inadmissible at Turner's trial." On appeal, Turner does not address the admissibility of the declarations.

We agree with the district court. Not only do some of the declarations rely heavily upon inadmissible hearsay, but others speak to knowledge of Savage's reputation in the community without providing an adequate legal foundation for that knowledge. Furthermore, two of the declarations came from prison cellmates of Turner's, which Mr. Ellery could have chosen not to introduce because either the jury would disbelieve the testimony of inmates or the testimony would remind the jury that Turner had been previously incarcerated.

None of the declarations support Turner's claim that he was the victim of a

homosexual attack. Thus, Turner has failed to demonstrate how this additional evidence would have changed the outcome of the guilt phase of the trial. We therefore conclude that Mr. Ellery's failure to present the proffered inadmissible evidence of Savage's aggressiveness and homosexuality did not fall below an objective standard of reasonableness.

We are similarly unpersuaded that Mr. Ellery was constitutionally ineffective for allowing "the homosexual bar frequented by Savage to be portrayed as a bar where homosexuals just happened to gather," failing to establish that the semen on the tip of Savage's penis was not coincidental with emission at death, and failing to preserve matchbooks from homosexual establishments found in Savage's house. Mr. Ellery, in fact, put on evidence that the bar was reputed to be a homosexual bar and that the semen could have resulted from sexual excitement. Further, he could have reasonably concluded that matchbooks from homosexual establishments would not be of significant value at trial, and therefore, were not worth preserving.

Thus, the deficiencies that Turner alleges do not support a claim of constitutional ineffectiveness. Nor has Turner carried his burden of showing there is a reasonable probability that, if counsel had introduced such evidence, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. We therefore affirm the district court's ruling that Mr. Ellery's representation passed constitutional muster.

### d. Representation of Turner's Interests at Trial.

Under the rubric of inadequate representation of Turner's interests at trial, Turner claims Mr. Ellery was deficient in several other respects. He claims that Mr. Ellery was ineffective by failing (i) to exclude evidence of Turner's prior felony convictions; (ii) to object to the testimony of the prosecution's rebuttal expert witness, Dr. Coleman, and to cross-examine him adequately; (iii) to give an adequate and complete closing statement; (iv) to adequately question jurors on their views of the death penalty; (v) to object to the State's use of a videotape made at the murder scene; (vi) to associate second counsel; and (vii) to request adequate jury instructions. The district court rejected the first two of these arguments on the merits, finding that Turner's prior convictions were legally introduced under new section 28(f) of the California Constitution and that Mr. Ellery did in fact object to Coleman's testimony, however unsuccessfully. The court rejected the remaining five arguments on the ground that "Turner has failed to direct the Court's attention to any facts which might suggest why or how the alleged omissions constitute constitutional incompetence or that the result of the guilt proceedings would have been different had the alleged omissions not occurred."

On appeal, Turner does not develop his arguments any further; he simply includes them in his list of specific examples of ineffective assistance of counsel. He does not discuss why the district court erred by rejecting the first two claims on the merits; nor does he respond to the court's admonishment for failing to provide any reasoning as to why the remaining five claims constitute ineffective assistance. Because Turner failed to demonstrate either that Mr. Ellery was deficient in any of the seven ways he enumerates, or that, but for his deficiency, the result of the proceedings would have been different, we conclude that none of these seven grounds supports a claim of ineffective assistance of counsel.

### e. Second Degree Murder Plea Offer.

Before trial and after the homosexual aspects of the case had been thoroughly

investigated by the Merced County Sheriff's Department, Turner was offered a plea agreement of second degree murder, which, according to the declaration of habeas counsel, was never withdrawn. Turner contends that Mr. Ellery was constitutionally ineffective because he failed to counsel him "on the consequences of going to trial and ... failed to discuss in detail the significance of the plea agreement offered." Turner argues that an effective, competent, diligent counsel would have advised him to accept the plea offer under the circumstances of his case and that no rational trial strategy supported Mr. Ellery's decision not to advise Turner to accept the plea. We disagree.

The district court believed that resolution of this claim depended on two factors: "(1) whether Turner was or reasonably should have been aware that a first degree murder conviction and the death sentence were possible outcomes if he chose to go to trial and lost; and (2) whether Mr. Ellery's defense strategy was reasonable." Despite Turner's claims that Mr. Ellery told him that his "was not a death penalty case" and that there was no likelihood that he would be convicted of first degree murder, the district court found Turner's claim that he did not consider the possibility of a death sentence to be incredible. Turner sat through the death qualification questions during jury voir dire and was present when the court recited the content of the charging information, which included the possible penalty of death. Furthermore, the district court did not find that Mr. Ellery's strategy of going to trial was unreasonable, particularly given Turner's admission that he was aware of the plea offer, that he considered it overnight, and then he decided to proceed to trial.

The Sixth Amendment guarantees criminal defendants the "constitutional right to be represented by counsel at all critical stages of the prosecution, including the plea proceeding." *United States v. Akins*, 276 F.3d 1141, 2002 WL 24358, at *3 (9th Cir. 2002) (citations omitted). We have held that "the decision to reject a plea bargain offer and plead not guilty is also a vitally important decision and a critical stage at which the right to effective assistance of counsel attaches." *United States v. Zelinsky*, 689 F.2d 435, 438 (1982). Thus, *Strickland*'s two-prong test applies to ineffectiveness claims arising from the plea process. *Hill v. Lockhart*, 474 U.S. 52, 57–58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). The first part of the inquiry is whether "counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.' " *Id.* at 56, 106 S.Ct. 366(quoting *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). The second part, the prejudice inquiry, "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id.* at 59, 106 S.Ct. 366. In other words, to satisfy the "prejudice" requirement, Turner must show that, but for counsel's errors, he would have pleaded guilty and would not have insisted on going to trial. *Id.*

In *United States v. Blaylock*, we held that counsel's "failure to communicate the government's plea offer to his client constitute[d] unreasonable conduct under prevailing professional standards." 20 F.3d 1458, 1466 (9th Cir.1994). Because in Blaylock's case the failure was prejudicial, we remanded for an evidentiary hearing to determine whether Blaylock would have accepted the plea offer. *Id.* at 1466–67. That Blaylock chose to proceed to trial did not discount the possibility of prejudice because Blaylock did not know about the plea offer. *Id.* at 1467. Furthermore, Blaylock stated at sentencing that he would have accepted the plea, particularly

given the trial court's apparent willingness to grant a two-point reduction for acceptance of responsibility. *Id.*

On the other hand, in *Jones v. Wood,* we concluded that Jones had failed to demonstrate that he would have accepted the plea offer had his trial counsel informed him that it was made. *Jones v. Wood,* 114 F.3d 1002, 1012 (9th Cir.1997). We rejected Jones's argument that he would have "cut his losses" and accepted the plea as "implausible in light of what Jones knew at the time the offer was made." *Id.* His lawyer had correctly informed him that the State's case was weak, and Jones, himself, had held steadfast to his claim of innocence. *Id.* Although we had no doubt that Jones would have taken the plea if he had known the result at trial, we did not believe a reasonable probability existed at the time of the offer that "Jones would have agreed to serve ten years in prison for a crime he insisted he did not commit rather than go to trial and face not terribly convincing evidence against him." *Id.*

The question whether counsel was deficient is more difficult where, as here, the client has been informed of the plea offer. "[A] defendant has the right to make a reasonably informed decision whether to accept a plea offer." *United States v. Day,* 969 F.2d 39, 43 (3d. Cir. 1992) (citing *Lockhart,* 474 U.S. at 56–57, 106 S.Ct. 366 (holding that voluntariness of a guilty plea depends on the adequacy of counsel's legal advice)). In *McMann v. Richardson,* the seminal decision on ineffectiveness of counsel in plea situations, the Court described the question as not whether "counsel's advice [was] right or wrong, but ... whether that advice was within the range of competence demanded of attorneys in criminal cases." *McMann,* 397 U.S. at 771, 90 S.Ct. 1441. Thus, for Turner to establish a claim of ineffective assistance, he "must demonstrate gross error on the part of counsel...." *Id.* at 772, 90 S.Ct. 1441. The Third Circuit has interpreted this standard as requiring a defendant to demonstrate that "the advice ... he received was so incorrect and so insufficient that it undermined his ability to make an intelligent decision about whether to accept the [plea] offer." *Day,* 969 F.2d at 43. In *Day,* the Third Circuit held that counsel was ineffective because he affirmatively misrepresented that Day faced a maximum sentence of eleven years in prison and failed to inform him that he would be classified as a career offender for sentencing. *Id.* at 40, 43–44.

Turner does not allege that Mr. Ellery failed to inform him about the plea offer. Nor does he allege that Mr. Ellery affirmatively misled him about the law. Instead, he claims that Mr. Ellery failed either to counsel him on the consequences of going to trial or discuss in detail the significance of the plea agreement offered. According to habeas counsel, Mr. Ellery conveyed the offer to Turner but did not encourage him to accept it because "[h]e felt like Thad had a story to tell." And, in fact, had the jury accepted the defense theory—that Turner had killed in a violent reaction to an attempted homosexual rape and taken the victim's property as an after—thought it could have acquitted or returned a non-capital conviction. Mr. Ellery told habeas counsel that, in retrospect, "he never knew how hard to push any defendant to accept an offer," and that "he was shocked when the jury came back with a guilty verdict." Although Turner argues that Mr. Ellery "always relayed to me that the worst result I could expect was 15 years to life for second degree murder and that a good possibility existed for manslaughter," he admits in his declaration that Mr. Ellery told him of the second degree murder offer, let him think

about it overnight, and then agreed with Turner's eventual decision to go to trial.

As the Court observed in *McMann*, "uncertainty is inherent in predicting court decisions." *McMann*, 397 U.S. at 771, 90 S.Ct. 1441. Counsel cannot be required to accurately predict what the jury or court might find, but he can be required to give the defendant the tools he needs to make an intelligent decision. Here, the district court correctly found that Turner was adequately informed that his case could result in a death sentence given that he sat through the reading of his criminal information and the death-qualifying jury voir dire, and that he was informed of the terms of the plea offer, thought about it overnight, and decided to turn it down. Thus, Turner had the tools he needed to make an informed decision—the critical information and time to think about it.

Turner's self-serving statement, made years later, that Mr. Ellery told him that "this was not a death penalty case" is insufficient to establish that Turner was unaware of the potential of a death verdict. *See United States v. Allen*, 153 F.3d 1037, 1041 (9th Cir.1998) (citing *Cuppett v. Duckworth*, 8 F.3d 1132, 1139 (7th Cir. 1993) (en banc) ("[S]elf-serving statements by a defendant that his conviction was constitutionally infirm are insufficient to overcome the presumption of regularity accorded state convictions.")). If the rule were otherwise, every rejection of a plea offer, viewed perhaps with more clarity in the light of an unfavorable verdict, could be relitigated upon the defendant's later claim that had his counsel better advised him, he would have accepted the plea offer. Even taking all of Turner's and Mr. Ellery's declarations at face value, Turner was informed that he was subject to the death penalty, and of the plea offer. That counsel and Turner chose to proceed to

trial based on counsel's defense strategy and presumably sincere prediction that the jury would not award a sentence of death, does not demonstrate that Turner was not fully advised of his options. Trial counsel was not constitutionally defective because he lacked a crystal ball.

Furthermore, Turner provides no legal basis for his claimed right to discuss in detail the significance of a plea agreement, his claimed right to receive an accurate prediction of the outcome of his case, or that counsel has an obligation to "strongly recommend" the acceptance or rejection of a plea offer. Because Turner points to no "gross error on the part of counsel," *McMann*, 397 U.S. at 772, 90 S.Ct. 1441, we conclude that Mr. Ellery was not deficient in informing Turner about the plea offer.

2. Sufficiency of the Evidence of Guilt (Claim Two).

Turner contends that because the prosecution failed to establish that he had formed the intent to rob Savage before the violence occurred, the evidence was insufficient to sustain either his conviction for robbery or the finding of the special circumstance for murder in the commission of a robbery. Turner asserts that there was "substantial, credible evidence" showing he "did not have a pre-formed intent to rob." A habeas petitioner challenging his state criminal conviction under 28 U.S.C. § 2254 based on sufficiency of the evidence "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781. If the record supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326, 99 S.Ct. 2781. This standard applies to special circumstance findings as well as to guilt determinations. *Lewis v. Jeffers,* 497 U.S. 764, 781–82, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

■■ The district court, like the California Supreme Court, found that, viewing the evidence in the light most favorable to the prosecution, a reasonable juror could have found sufficient evidence to support both the conviction for robbery and the finding of the robbery-murder special circumstance. The California Supreme Court concluded that "there was strong and convincing evidence that defendant killed only after deciding to rob." *Turner,* 50 Cal.3d at 690, 268 Cal.Rptr. 706, 789 P.2d 887.

No direct evidence was presented to show that Turner intended to rob Savage before the violence began. To establish intent, the State relied exclusively on circumstantial evidence, particularly that two of Savage's three telephone lines were cut—the bedroom and living room phone cords, but not the kitchen cord, which was somewhat hidden. The State argued that because no blood was found on the cords, the jury could reasonably infer that Turner must have cut the cords before he attacked Savage to prevent him from calling for help. Turner denies having cut the phone cords.

Both the district court and the California Supreme Court, however, also found that the significant amount of missing property provided circumstantial evidence

of a preformed intent to rob. According to Greg Mayo, the missing items included two stereos, a tape cassette, miniature speakers, statues from a wall cabinet, glass tables, clothes, a television, and a car. Also persuasive on this point were the signs of prying and forced entry.

The courts further determined that Turner exhibited a pre-existing willingness to do harm to one who had befriended him because he went to Savage's home armed with a buck knife. *Turner,* 50 Cal.3d at 688, 268 Cal.Rptr. 706, 789 P.2d 887. The defensive nature of the wounds on Savage's back and hands were of particular interest to the California Supreme Court because they demonstrated that Savage was attempting to escape from attack, rather than attempting to initiate one. *Id.* at 688, 268 Cal.Rptr. 706, 789 P.2d 887. As the California Supreme Court reasoned, Turner's own story suggested that "he was not surprised, confused, or frightened by Savage's sexual interest, but rather suspected and exploited that possibility." *Id.* at 689, 268 Cal.Rptr. 706, 789 P.2d 887.

The evidence which the State relied upon to establish intent is hardly dispositive, and, as the district court observed, "[t]here is no question that the evidence before Turner's jury was conflicted as to when his intent to steal arose and what items he actually took." Although a large number of items were reported missing from Savage's house, Turner was found in possession of only the television, Savage's wallet, and his car. In fact, it is unlikely that Turner could have fit all of the stolen merchandise into Savage's Cadillac. A search of Turner's home produced none of the additional missing property, but, according to the record, the police did not look for any other suspects or conduct any other searches in an effort to find the stolen property.

Turner argues that Savage's cousin Mayo could have been responsible for taking some of the missing property. It is curious that, after learning the phone lines were cut, Mayo drove across town, past the Sheriff's station, to call the authorities. Moreover, Mayo, unlike Turner, would have fit into the stolen clothes. Finally, there is evidence that after the investigation began and Savage's family changed the locks on the house, someone tried to enter the house and broke a key in the new lock.

Turner makes a number of claims regarding the condition of the crime scene when he left that might support his theory that a second intruder entered the house after he killed Savage and stole the unaccounted-for property. For example, Savage was found with a clean pillow under his head, but Turner denied having put one there. That the pillow had no blood on it is an important detail because, when he left, Turner was covered with blood. Savage was found covered by towels, yet Turner insists that he covered Savage with a sheet. Moreover, Turner claims that he left Savage's body in a different position than that in which he was found.

Turner also presented evidence to show that he was not a "calculating criminal capable of premeditating a robbery-murder and efficiently disposing of large quantities of property." He made no attempt to dispose of the items he stole from Savage or to clean the blood off his shoes or the car. To rebut the assertion that carrying a buck knife demonstrated an intent to harm Savage, Turner testified that he habitually carried his buck knife with him because he was a construction worker. His officer manager verified that fact and added that Turner had never used the knife in a violent manner at work. Turner argued that had he intended to rob Savage, he would have used a better weapon

than a buck knife or he would have attacked Savage in a more effective manner.

Turner's story that he killed Savage not as part of a pre-meditated robbery-murder but rather in the course of defending himself against Savage's homosexual attack was corroborated by the testimony of the pathologist. As the pathologist testified, although there was no indication of semen in the rectum, Savage's sphincter was "looser than normal," a condition which is consistent with homosexual activity. Furthermore, traces of sperm were found on the orifice of the penis, which could have resulted either from an ejaculation due to sexual excitement or an ejaculation just prior to death. Because Turner was high on P.C.P. at the time, the district court concluded that he could have experienced a "violent reaction[ ] to external stimuli, possibly manifested by homophobia. . . ."

Although there is much evidence to support a finding that Turner formed the intent to rob only after the violent confrontation with Savage, we cannot say that a reasonable juror could not have found sufficient evidence to support a finding of robbery. The critical piece of evidence to support the verdict is the cleanly cut telephone cords. It is highly improbable that Savage himself, or someone coming on the scene after Savage was dead, would have cut them. With respect to this troubling evidence, we agree with the district court that

[t]he findings of the California Supreme Court must be upheld because Turner could not at trial, and cannot now offer a cogent argument to explain away the cut telephone cords. It is remote, as the California high court stated, 'that sometime between Saturday evening and Monday morning, someone else entered Savage's home, cut the telephone cords, stole all the missing property except that found in defendant's possession,

moved the body, and recovered it,' 50 Cal.3d at 689, 268 Cal.Rptr. 706, 789 P.2d 887, even someone with a key. There is simply no plausible explanation for why a person would come into the house and cut telephone cords to make it appear that a crime was premeditated when it is obvious that a serious crime had been committed.

Viewing the evidence in the light most favorable to the prosecution, *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781, we believe that a rational trier of fact could have been persuaded beyond a reasonable doubt that Turner was guilty of premeditated robbery and that the special circumstance of robbery-murder was true. It was rational for the jury to conclude that Turner cut the phone lines to prevent Savage from calling for help during the course of the robbery. That Turner was not found with all of the missing property is not determinative because he was found in possession of Savage's car, television, and wallet, and he easily had time to dispose of the other property. Savage's wounds support the prosecution's theory that he was defending himself from attack, and the number of stab wounds could be seen by a rational trier of fact as a desperate attempt to kill Savage before he managed to go for help. Thus, we reject Turner's sufficiency of the evidence argument and affirm the district court's decision to deny the writ on this ground.

3. Lesser–Included Offense Instruction (Claim One).

Turner asserts error in the trial court's failure to (1) instruct the jury *sua sponte* on the offense of theft, a lesser-included offense to the charge of robbery; and (2) provide jury verdict forms regarding theft. During trial, however, Turner did not request a jury instruction or verdict form regarding the offense of theft.

The district court found that because "[t]he trial court's failure to give a theft instruction, as the lesser-included offense of robbery, did not eliminate the jury's option to find first degree murder without special circumstances, a noncapital offense," the failure was not error. The jury was instructed on first degree murder based on the alternative theories of premeditated and robbery-felony-murder. The special circumstance finding was an independent finding based on robbery-felony-murder. Thus, the jury could have convicted Turner of first degree premeditated murder, without the special circumstance of robbery, and Turner would have been convicted of a noncapital offense. Because the district court believed that *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and its progeny require only that the jury not be faced with an all-or-nothing, capital conviction-or-acquittal choice, it found no error.

In the alternative, the district court, relying on the California Supreme Court, found that even if the failure to give a theft instruction was erroneous under federal law, the error was harmless because it was not prejudicial. As the California Supreme Court observed, the jury demonstrated its belief that Turner was guilty of robbery both in the conviction for Count II and in the special circumstance finding. *Turner,* 50 Cal.3d at 693, 268 Cal.Rptr. 706, 789 P.2d 887. The California court could not "imagine [the jury] would employ [a] reluctant verdict to support findings of *first degree murder* and *death eligibility* under a robbery-murder special circumstance." *Id.* Furthermore, "[k]nowing that a murder in the commission of robbery was the sole basis of defendant's eligibility for the death penalty, they nonetheless actually returned a death verdict." *Id.*

We agree with the district court that the failure to give the lesser-included

offense instruction and the related verdict forms did not violate the rule of *Beck*. *Beck* held unconstitutional an Alabama statute that prohibited jury instructions on lesser-included offenses in capital cases because "the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction...." *Beck*, 447 U.S. at 638, 100 S.Ct. 2382. Beck admitted his participation in a robbery through his own testimony, but denied that he killed the man or intended his death. *Id.* at 629–30, 100 S.Ct. 2382. The State conceded that, without the statutory prohibition on lesser-included offenses, petitioner would have been entitled to a lesser-included offense instruction on felony murder under state law. *Id.* at 630, 100 S.Ct. 2382.

With the statute, however, the jury was given the option of convicting petitioner for intentional killing in the course of a robbery, a capital crime, or acquitting him completely. Because petitioner had admitted to robbery, the Court reasoned that the jury would be "likely to resolve its doubts [as to petitioner's intent to kill] in favor of conviction," *id.* at 634, 100 S.Ct. 2382, and that therefore the failure to give the jury the option of a lesser-included offense "seem[ed] inevitably to enhance the risk of an unwarranted conviction." *Id.* at 637, 100 S.Ct. 2382. This was an intolerable risk in a capital case, *id.*, particularly when "it [had] long been 'beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.'" *Id.* at 635, 100 S.Ct. 2382(quoting *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973)).

This seemingly unqualified affirmance of the right to have juries instructed on those lesser-included offenses supported by the evidence was later limited by the Court in *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). In *Schad*, the petitioner was arrested for a parole violation and possession of a stolen vehicle. *Id.* at 628, 111 S.Ct. 2491. The owner of the stolen vehicle had been found, strangled to death, in the underbrush off U.S. Highway 89. *Id.* at 627, 111 S.Ct. 2491. The defense requested—and was denied— a jury instruction on robbery as a lesser-included offense of felony murder. *Id.* at 629, 111 S.Ct. 2491. The jury was given the option of three verdicts: first-degree murder, defined by the court as either premeditated or murder committed in the attempt to commit robbery, second-degree murder, or not guilty. The jury was not required to agree on which theory of first-degree murder applied. *Id.*

The *Schad* Court distinguished the *Beck* decision on the grounds that "the jury here was given the option of finding petitioner guilty of a lesser included noncapital offense, second-degree murder." *Id.* at 646, 100 S.Ct. 2382. Not present in *Schad* was the "fundamental concern in *Beck* ... that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." *Id.* In addition to the choice between conviction of a capital offense and acquittal, the jury had a third option: a conviction for second-degree murder. *Id.* at 647, 100 S.Ct. 2382. That this third option was second-degree murder, as opposed to robbery, the lesser-included offense of felony murder, did "not diminish the reliability of the jury's capital murder verdict" because the Court saw no basis on which to assume that "a jury unconvinced that petitioner was guilty of either capital or second-degree murder, but loath to acquit him completely (because it was convinced he was guilty of robbery), might choose capital

murder rather than second-degree murder as its means of keeping him off the streets." *Id.*

We applied *Beck* and *Schad* in *Villafuerte v. Stewart*, 111 F.3d 616 (9th Cir. 1997). Villafuerte, charged with murder, kidnapping, and theft, argued that the trial court erred by failing to instruct on unlawful imprisonment as a lesser-included offense of kidnapping. *Villafuerte*, 111 F.3d at 622. Reasoning that "Villafuerte's jury was given instructions which permitted verdicts of guilty or not guilty of murder, kidnapping (both dangerous and nondangerous), and theft," we held "[t]he all-or-nothing situation found intolerable in *Beck* was not present." *Id.* at 623. Furthermore, the jury had specifically asked whether it was required to find Villafuerte guilty of murder if it found him guilty of kidnapping, and the trial court answered no. *Id.* Thus, because the jury knew that it could find Villafuerte guilty of kidnapping without murder if it did not believe that Villafuerte caused the victim's death (a point that he argued), their choice was not all-or-nothing. We held that there was no constitutional error. *Id.* at 623–24.

Turner argues that his case is factually distinguishable from both *Schad* and *Villafuerte* because he admitted both the theft and that he killed Savage (although he claimed the killing was in self-defense or in defense against an atrocious crime). *Turner*, 50 Cal.3d 668, 682–86, 718, 268 Cal.Rptr. 706, 789 P.2d 887. Neither *Schad* nor *Villafuerte* admitted to killing their victims, and although Schad was found in possession of his victim's property, he did not admit to wrongfully taking the property, but told police he was transporting it for a friend. *Schad*, 501 U.S. at 628, 111 S.Ct. 2491. Furthermore, although one of the theories advanced by the prosecution in Schad's case was robbery/felony-murder, he was not charged

with the independent crime of robbery. *Id.* at 629, 111 S.Ct. 2491.

We disagree with Turner's argument. As in *Schad* and *Villafuerte*, and unlike in *Beck*, here, the jury was not faced with the choice between a conviction of a capital offense or acquittal. Although Turner was charged with murder (Count I), robbery (Court II), and the special circumstance of willful and deliberate killing during the course of, or the attempted commission of, robbery, the court instructed the jury on the elements of (i) first degree murder, whether through robbery/ felony-murder or premeditation; (ii) second degree murder; and (iii) manslaughter, both voluntary and involuntary. The court also distinguished between theft and robbery when it instructed the jury about the elements required for a robbery conviction:

> If an individual kills another for reasons unrelated to the theft, for example, because of anger, fear or revenge, and then decides to take advantage of the situation the taking will constitute at most a theft and not a robbery.

The court also instructed the jury on the necessary elements for special circumstances predicated on robbery. Thus, the trial court's failure to give the lesser-included offense of theft instruction left open to the jury at least four alternatives for a finding of guilt of a noncapital offense: (1) first degree murder without special circumstances; (2) second degree murder; (3) voluntary manslaughter; and (4) involuntary manslaughter. Therefore, the failure to *sua sponte* give the lesser-included offense of theft instruction was not error.

4. "Shall Impose" Instruction (Claim Fourteen).

 Turner's argument that the mandatory language contained in the jury instruction violates the Constitution is foreclosed by the Supreme Court's decision in

*Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); *see also Bonin v. Calderon,* 59 F.3d 815, 849 (9th Cir.1995) (rejecting the same argument in light of *Boyde* ).

The instruction reads:

If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death.

However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole.

Although Turner agrees that *Boyde* forecloses his constitutional argument as to the instruction, he argues that the otherwise constitutional instruction was rendered defective by the prosecutor's closing argument, and, that in combination with the jury instruction, it prevented the jury from making an individualized sentencing determination.

Contrary to Turner's claim, we conclude that the prosecutor's argument, when combined with the "shall impose" jury instruction, did not prevent an individualized sentencing determination. The prosecutor did not reinforce the notion that the jury lacked discretion once an arithmetical counting process had taken place, nor did either party fail to inform the jury that it had the ultimate sentencing discretion. The jury was well-informed of its duty to weigh all the aggravating and mitigating factors and instructed on all the factors listed in California Penal Code § 190.3, including the catch-all factor (k), which provides for consideration of "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

In giving this instruction, the trial court went beyond the statutory requirements of Section 190.3, factor (k), by instructing the jury to consider "[a]ny other circumstances which extenuates the gravity of the crime even though it is not a legal excuse for the crime *and any other aspect of the Defendant's character or record that the Defendant offers as a basis for the sentence less than death.*" (emphasis added). Thus, the trial court conformed with the recommendation of the California Supreme Court in *People v. Easley,* 34 Cal.3d 858, 878–79, 196 Cal.Rptr. 309, 671 P.2d 813 (1983). Finally, the very language of the instruction requires the weighing of the aggravating and mitigating circumstances before the decision on punishment is made.

Turner therefore is not entitled to habeas relief on this claimed instructional error.

5. Double Jeopardy (Claim Eleven).

Turner argues that he was twice placed in jeopardy when the court released the jury pending the penalty phase, realized the verdict form for Count II was not completed, and then reconvened the jury for deliberations on Count II prior to beginning the penalty phase. Because the court never lost control of the jury, however, we reject Turner's claim of double jeopardy.

On Wednesday, November 21, 1984, the jury returned its verdict, finding Turner guilty of first degree murder and finding true the special circumstance of murder in the commission or attempted commission of a robbery. *Turner,* 50 Cal.3d at 699–700, 268 Cal.Rptr. 706, 789 P.2d 887. The verdict was read by the clerk of the court, the jurors were polled, admonished, and instructed to return the following Tuesday after Thanksgiving to begin the penalty phase of the trial. *Id.* at 700, 268 Cal.

Rptr. 706, 789 P.2d 887. Prior to their release, the jurors were admonished:

> [Y]ou are now asked to return and required to return next Tuesday morning at 10:00 o'clock, to the jury room of this department, and we'll proceed with the next phase of the trial at that time. Now, almost inevitably, at this stage, there will be additional publicity. And that publicity may come from local newspaper or radio station, or it may come from Fresno or Modesto newspaper or radio stations or television stations.
>
> Please, it's extremely important that you do not expose yourself to such publicity. Please do refrain from listening to and avoid reading anything about the case.
>
> So far as your state of mind is concerned, while you've reached a verdict with regard to what we refer to as the guilt phase of this trial, the penalty phase remains before you.
>
> And it is very important that you do not discuss this matter with anyone, that you not permit anyone to discuss it with you, that you not permit anyone to discuss it in your presence, that you not discuss the penalty phase with each other at this time.
>
> Because there are additional instructions and additional information which will be give[n] to you before the time that you are called upon to retire and deliberate upon that point.
>
> Then we admonish you not to discuss the matter among yourselves or with anyone else. Not to permit anyone else to discuss the matter with you or in your presence. And that you not form or express an opinion or a conclusion upon the penalty phase of this matter until it's finally submitted to you.

The jurors were then released for the holiday weekend. Neither counsel objected to nor commented on the fact that no verdict was returned with respect to Count II—robbery. That afternoon, the trial judge realized that the jury had not signed and returned the Count II verdict form, and attempted to recall the jury. Because four jurors could not be located, the trial judge, reasoning that the jury was not discharged, suggested taking the matter up Tuesday morning before the penalty phase began. Turner's counsel objected, arguing that the jury was only admonished not to talk about the penalty phase and therefore should be considered discharged for purposes of all guilt phase issues. The trial court disagreed. Having admonished the jury prior to its dismissal, "it could direct the jurors either to record any decision they had already reached on the robbery count, or to resume deliberations on that issue." *Id.* at 700, 268 Cal.Rptr. 706, 789 P.2d 887.

The court attempted to reconvene the jury before Thanksgiving and located nine available jurors and two alternates; three jurors still could not be found. *Id.* The foreman informed the court that the jury had reached a verdict with respect to Count II, but had not signed the verdict form because of a miscommunication with the court. *Id.* According to the foreman, the jurors had asked the court if they had to render a verdict as to Count II if they found Turner guilty of Count I, to which the court had answered no. The court interpreted the note differently, believing that the jury was asking whether it had to make specific findings for the lesser-included offenses of second degree murder and manslaughter, as opposed to a finding on the second separable offense of robbery. After informing the jury of the problem with the verdict form, the trial court stated that it would "undertake no proceedings" until Tuesday morning when all the members of the jury were present. Those jurors present were admonished

once again not to discuss the case, and were permitted to leave. While it had been partially convened, the jury did not discuss anything improper with the court (*i.e.*, the deliberative process) or resolve anything without the presence of all its members.

▄▄▄▄ Under these circumstances, Turner was not twice put in jeopardy. The Double Jeopardy Clause protects defendants against: "(1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." *Staatz v. Dupnik*, 789 F.2d 806, 808 (9th Cir.1986). Such protections are intended to insure that "the State with all its resources and power [is] not ... allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). Because Turner has not been subject to repeated attempts at conviction or multiple sentences for the same crime, his claim does not implicate the Double Jeopardy Clause. Turner was not acquitted of robbery (Count II), and then retried— there was simply a miscommunication about completion of the verdict form, which the same trier of fact was asked to resolve.

The identical argument was rejected in *People v. Bonillas*, 48 Cal.3d 757, 257 Cal. Rptr. 895, 771 P.2d 844 (1989), with which we agreed in *Bonillas v. Hill*, 134 F.3d 1414 (9th Cir.1998). In *Bonillas*, the California Supreme Court affirmed a first degree murder conviction, despite the jury finding the defendant guilty of murder,

without furnishing a verdict form that specified the degree of murder. *People v. Bonillas*, 48 Cal.3d at 769, 257 Cal.Rptr. 895, 771 P.2d 844. The trial court reconvened the jury four days later, in advance of the date penalty proceedings were scheduled to begin, to specify its decision with respect to the degree of murder. The California Supreme Court held that "jurisdiction to reconvene the jury depends on whether the jury has left the court's control." *Id.* at 770–71, 257 Cal.Rptr. 895, 771 P.2d 844 (alteration in original). Once the jury leaves the court's control, it cannot be recalled. After reviewing the facts, the court concluded:

> Where, as here, further proceedings are to take place, the jury has not been discharged, the jurors have been specifically instructed that they are still jurors in the case, they have been admonished not to discuss the case with anyone nor to permit anyone to discuss the case with them, and they have been directed not to read anything about the case, the jurors have not thrown off their character as jurors nor entered the outside world freed of the admonitions and obligations shielding their thought processes from outside influences. Clearly, the jury here remained within the court's control....

*Id.* at 773, 257 Cal.Rptr. 895, 771 P.2d 844.

Reviewing Bonillas's federal habeas petition, we agreed with the California Supreme Court, concluding that it "reasonably construed its prior precedent to require that the jury also be discharged before the trial court loses its jurisdiction to reconvene the jurors." *Bonillas v. Hill*, 134 F.3d at 1417. Thus, "[b]ecause the trial court was authorized to reconvene the jury to complete the verdict, the jury lawfully made an express finding of first degree murder." *Id.*

Turner does not attempt to distinguish his case from *Bonillas*, but argues instead that the court did not remain in control of the jury because its attempts to reconvene failed. We disagree.

Being unable to recall the jurors in a single afternoon does not constitute losing control of the jury in the specific context of trial proceedings. Here, the trial court retained control of the jury between the guilt and penalty phases of the trial. Thus, the jurors were not released to "the outside world freed of the admonitions and obligations shielding their thought processes from outside influences." *People v. Bonillas*, 48 Cal.3d at 773, 257 Cal.Rptr. 895, 771 P.2d 844. Rather, they continued in their roles as jurors under instruction of the court, and subject to all of their continuing obligations as jurors in Turner's case.

■■■ Finally, as the district court correctly noted, even if Turner's robbery conviction violated the Double Jeopardy Clause, it would not affect his sentence of death. A defendant need not be charged with the additional offense of robbery for a jury to find the special circumstance of murder in the course of a robbery or attempted robbery. *People v. Miller*, 28 Cal.App.4th 522, 526, 33 Cal.Rptr.2d 663 (1994).

### 6. Cumulative Error (Claim Fifteen).

Turner argues that the cumulative lack of fundamental fairness in the trial proceedings mandates reversal. As discussed above, however, we fail to find that any of Turner's alleged trial errors presented a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638, 113 S.Ct. 1710. Cumulatively, Turner's claims of alleged trial error create no more prejudice than they do independently.

### 7. Ineffective Assistance of Counsel at the Penalty Phase/ Failure to Grant Evidentiary Hearing (Claims Four and Twenty–One).

Turner independently contends that the district court unlawfully denied his request for an evidentiary hearing (claim twenty-one) because he sufficiently alleged colorable claims of constitutional deprivation in claims four, five, nineteen, and twenty.

■■■ "A state habeas petitioner is entitled to an evidentiary hearing on a claim if he did not receive a full and fair evidentiary hearing in state court and if he alleges facts that, if proven, would entitle him to relief." *Tapia v. Roe*, 189 F.3d 1052, 1056 (9th Cir.1999). In other words, he must allege a colorable constitutional claim. "Pursuant to 28 U.S.C. § 2255, a district court must grant a hearing to determine the validity of a petition brought under that section, '[u]nless the motions and the files and records of the case *conclusively show* that the prisoner is entitled to no relief.'" *Blaylock*, 20 F.3d at 1465 (quoting 28 U.S.C. § 2255 (1988), which remained unchanged in the pre-AEDPA law applicable to Turner's case) (alteration in original).

■■■ We do not have "a per se rule requiring an evidentiary hearing whenever a petitioner has made out a 'colorable claim' of cause." *Babbitt*, 151 F.3d at 1177 (internal quotations omitted). "Rather, a petitioner must establish that his allegation ..., if proven, would establish [a constitutional deprivation]." *Id.* Entitlement to an evidentiary hearing based on alleged ineffective assistance, for example, requires a showing that if his allegations were proven at the evidentiary hearing, deficient performance and prejudice would be established. We review a district court's decision to deny an evidentiary

hearing for abuse of discretion. *Tapia,* 189 F.3d at 1056.

Applying these standards to the claims before us, we conclude that Turner is entitled to an evidentiary hearing as to claim four, ineffective assistance of counsel at the penalty phase. Because we do not deem claims five, nineteen, or twenty to be worthy of even a certificate of appealability, the district court properly denied an evidentiary hearing on those claims.

■ Turner's claim that Mr. Ellery was ineffective during the penalty phase is compelling. He asserts that Mr. Ellery (i) failed to develop and introduce mitigating evidence; (ii) failed to request the proper jury instructions; and (iii) made a deficient final argument. At the penalty phase, the relevant inquiry as to whether counsel was effective is "whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. Here, trial counsel's failure to develop and introduce mitigating evidence may fall below the *Strickland* standard. Whether this is so can only be determined through an evidentiary hearing, however, and thus, we remand this claim to the district court to conduct one.

a. Failure to Develop and Introduce Mitigating Evidence.

■ "Although there is a strong presumption that an attorney's conduct meets the standard of effectiveness,'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Smith v. Stewart,* 241 F.3d 1191, 1198 (9th Cir.2001) (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052).

Preparing for the penalty phase of a capital trial is the equivalent of preparing for an entirely new trial, and trial counsel must treat it as such. An investigation that was sufficient at the guilt phase may be deficient at the penalty phase because "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams v. Taylor,* 529 U.S. 362, 398, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Hendricks,* 70 F.3d at 1043 ("Evidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense to conviction in the guilt phase.").

■ Because all relevant mitigating evidence must be considered during the penalty phase, *Eddings v. Oklahoma,* 455 U.S. 104, 117, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the scope of trial counsel's penalty phase investigation must necessarily be broader than that conducted at the guilt phase. "[I]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase," *Smith,* 241 F.3d at 1198 (citation omitted), even if trial counsel then decides against introducing it in accordance with his penalty phase trial strategy. *See also Ainsworth v. Woodford,* 268 F.3d 868, 873–74 (9th Cir.2001) (holding defense counsel's penalty phase performance constitutionally deficient where counsel "failed to adequately investigate, develop, and present mitigating evidence to the jury even though the issue before the jury was whether[the defendant] would live or die"); *Caro v. Calderon,* 165 F.3d 1223, 1227 (9th Cir.1999) ("[I]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase.") (citation omitted).

■ Thus, we have held that "[w]here counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Hendricks*, 70 F.3d at 1043; *see also Lambright v. Stewart*, 241 F.3d 1201, 1207 (9th Cir.2001) (failing to obtain a psychiatric evaluation of a defendant, knowing his wartime experience and his extensive drug use, constituted deficient performance, as did "fail[ing] to interview family members, in light of indications of a mental disorder").

■ Turner claims prejudice in Mr. Ellery's failure to develop and introduce mitigating evidence during the penalty phase. In California, the admissibility of aggravating and mitigating factors is governed by California Penal Code § 190.3, which provides for a wide range of evidence to be considered by the jury in weighing whether the penalty of death or life without possibility of parole is the more appropriate penalty for the individual before it. Far from developing and introducing the statutorily indicated evidence to aid in the jury's heavy responsibility, Mr. Ellery admitted to the judge that he was not prepared to proceed with this phase of trial. Even though Mr. Ellery called six witnesses to testify, the entire penalty phase took less than one day, and the jury returned its verdict of death in just over an hour. As summarized by the California Supreme Court, the prosecution's penalty phase evidence consisted of the following:

> The only new prosecution evidence introduced at the penalty phase concerned the circumstances of the homicide. Pathologist Murdoch was recalled to testify in detail concerning the number, angles, depths, and force of the stab wounds in Savage's body. Dr. Murdoch empha-

sized that most of the wounds were deep and were inflicted with considerable force. According to Dr. Murdoch, the superficiality of certain cuts was caused by the fact that the knife had struck bone before penetrating deeply. Dr. Murdoch's testimony was illustrated by photographs which showed forcep-like devices inserted in the wounds to demonstrate their depths.

*Turner*, 50 Cal.3d at 687, 268 Cal.Rptr. 706, 789 P.2d 887.

The defense evidence consisted of the following:

> Detective Strength testified that the remote control for the upstairs television was not taken. Ruth Turner, defendant's mother, testified that defendant had been a gentle and helpful child and youth, who made average grades in school and caused little trouble; he gave her a portion of each paycheck from his post-prison job as a carpenter's helper. Ms. Turner noted that defendant's brother and three sisters had never been in trouble with the law; two sisters were currently attending college. A half-sister, an older cousin, and a neighbor confirmed that defendant had been quiet, gentle, and loving. A job developer, Louis Coleman, testified that defendant received good reports for punctuality and reliability in post-prison job placements.

*Id.*

Turner argues that had Mr. Ellery "called experts properly qualified on the subject of the effects of P.C.P. and had [he] called family witnesses and friends who had observed his radical behavioral changes while under the influence of drugs, such mitigating evidence might have influenced the jury to bring back a verdict other than death." We must agree.

Turner's argument can be broken down into three evidentiary categories. First, Turner alleges that, despite the jury's rejection of his diminished intent or diminished responsibility argument at the guilt phase, Mr. Ellery should have investigated and presented further evidence of Turner's drug use and the effects that it had on him. Second, Turner implicitly argues that evidence of his abusive and difficult childhood should have been investigated and introduced. Further inquiry would have revealed for example that, if asked, his mother would have testified that his father "socked him in the head and forced him to sit on a dangerous embankment as a form of discipline." Additional investigation also have revealed that, contrary to his mother's testimony, his transcripts demonstrated low grades and low achievement scores. Third, Turner alleges that, as his probation reports from his earlier incarceration indicate, approximately ten individuals, from school teachers to employers, could have been called upon to testify on his behalf, giving him "a far more complete penalty phase than what was presented at trial."

After reviewing the requirements for constitutionally effective assistance of counsel, the district court found that Turner had failed to demonstrate the need for an evidentiary hearing and concluded that counsel was not constitutionally ineffective. With respect to the first category of omitted evidence—that of Turner's drug use—the district court stated:

> Much of the evidence Turner claims should have been developed and introduced by Mr. Ellery, in fact, *could*, have been mitigating to the imposition of the death penalty. Evidence of Turner's prolonged drug use and its effects could have attenuated the impression jurors had of Turner as a malicious, opportunistic killer. Whereas during the guilt proceedings evidence of Turner's past

drug use and violent drug reactions would not have been helpful to his case in assessing his criminal responsibility for killing Mr. Savage, the accumulation of toxic substances in his system together with an explanation by qualified experts as to why a person resorts to such drug use and how those drugs could affect a person with Turner's background may have been more persuasive on sentencing.

Despite these findings, however, the district court does not appear to have specifically addressed whether Mr. Ellery was ineffective for failing to adduce evidence of narcotics usage in the penalty phase. The only reference to Turner's drug use in the court's analysis is found in its conclusion that Mr. Ellery's alleged failure to develop and present evidence concerning Turner's family and background (the second category of omitted evidence) was not constitutionally incompetent:

> Unlike the defendant in *Eddings* [who was 16], Turner was 22 at the time of the crime, and was no longer subjected to abuse from his father. As measured against the brutality of the crime, Turner's family history is too attenuated to have swayed the jury to impose a lesser sentence. Nor would Turner's voluntary drug use have moved jurors in Merced County to sympathy. The proffered evidence must be considered in the context of the crime and the venue in which the case was tried. In that context, Mr. Ellery's alleged failures do not amount to constitutional incompetence. Nor is there prejudice.

With respect to the third category of omitted evidence, allegedly favorable letters and reports from former teachers and employers, the district court stated:

> None of these documents have been produced for the Court's review, and as far

as the record demonstrates, they were not produced in state court either. To the extent the evidence was available, as Turner claims, and it was not presented during state proceedings, it is subject to the restriction mandated in *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318, that cause and prejudice, or a fundamental miscarriage of justice must be demonstrated before the evidence may be considered on federal habeas. The required showing has not been made.

We believe that Turner does meet the standard for an evidentiary hearing as to ineffective assistance of counsel at the penalty phase. It is clear from the record that Mr. Ellery was not prepared to begin the penalty phase when the jury returned its verdict of first degree murder. Even the State informed the court that, "in all fairness to the defendant," the defense needed more time to prepare for this phase of trial.

It is also clear from the record that Mr. Ellery was on notice of both Turner's history of extensive drug use and of his claim to have smoked P.C.P on the day of the homicide. Despite this information, Mr. Ellery did not question any of his penalty phase witnesses about Turner's drug use. Nor did Mr. Ellery call any additional experts to supplement Dr. Hamm's guilt phase testimony about the effects of P.C.P., even though the focus of the two phases was completely different: At the guilt phase Mr. Ellery was trying to establish lack of premeditation and intent as a defense, while at the penalty phase Mr. Ellery should have been trying to make Turner seem less culpable and therefore more deserving of life. Not only did Mr. Ellery fail to question Turner's mother, half-sister, and cousin, all of whom he called to testify at the penalty phase, about Turner's drug use, he also failed to question them about whether Turner's father was abusive towards his children or whether there was any history of substance abuse in the family. In sum, Mr. Ellery did nothing to demonstrate that Turner's actions were influenced by his early childhood.

Turner's declarations indicate that Turner's family and friends had information that may have influenced the jury to spare Turner's life. Turner's family and friends could have testified about his drug use, his abusive family home, his intellectual slowness, and his victimization in prison. For example, Turner's three sisters would have testified that their father repeatedly beat their mother and their brother, and that their father used razors when beating Turner. One sister would have testified that when her mother got mad she whipped the children with switches, extension cords, telephone wires, and big plastic wheel tracks. The three sisters also would have testified that they lived in fear of their father who was often drunk. Finally, they would have testified that, contrary to Mrs. Turner's testimony, Turner had difficulty in school and had always been considered "slow."

Declarations from two of Turner's friends demonstrate that they never considered Turner to have a violent nature or to enjoy fighting. They believed that, due to his peaceful nature, Turner was victimized when he was previously incarcerated in the Fresno County Jail. According to one friend, Turner had been raped regularly. Furthermore, both declarations confirm Turner's "amazing sherm habit"— up to two P.C.P.-laced cigarettes a day. Thus, Turner has alleged sufficient facts with respect to Mr. Ellery's failure to investigate and present evidence of his long-term drug use and his abusive and difficult childhood, which, if true, could have altered the result of the penalty phase. Be-

cause he failed to uncover potentially persuasive mitigating evidence, we conclude that Mr. Ellery's penalty phase assistance may have been constitutionally ineffective.

There is no evidence in the record, however, as to the investigation Mr. Ellery did conduct or his penalty phase strategy. For example, Turner states that at an evidentiary hearing, Mr. Ellery would testify that he had not prepared for the penalty phase, and that he never treated Turner's case as a capital case. Turner also represents that his mother would testify that Mr. Ellery did not interview her in depth about his father's alcoholism or about their family's background. Because the motions, files, and records in this case do not conclusively show whether Turner is entitled to relief, we remand for an evidentiary hearing on whether Mr. Ellery's failure to investigate mitigating evidence constituted constitutionally ineffective assistance of counsel at the penalty phase. *See Siripongs v. Calderon*, 35 F.3d 1308, 1314 (9th Cir.1994) ("[W]ithout the benefit of an evidentiary hearing ... we cannot determine if counsel's decision was a strategic one, and if so, whether the decision was a sufficiently informed one.") (second alteration in original) (quoting *Hendricks*, 974 F.2d at 1109); *Blaylock*, 20 F.3d at 1465 ("Pursuant to 28 U.S.C. § 2255, a district court must grant a hearing to determine the validity of a petition brought under that section, '[u]nless the motions and the files and records of the case *conclusively show* that the prisoner is entitled to no relief.'") (quoting 28 U.S.C. § 2255).

We agree with the district court, however, that Turner's two remaining claims of ineffective assistance of counsel at the penalty phase, involving the jury instructions and closing argument, lack merit.

b. The Failure to Request Proper (and to Object to Improper) Jury Instructions.

Turner alleges eleven errors involving trial counsel's failure to request certain jury instructions and to object to other jury instructions during the penalty phase. Aside from listing his eleven claims of error, citing the "substantial and injurious effect" standard of *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and briefly discussing why the trial court should have given the mental disease instruction (then contained in CALJIC 3.36), Turner does not demonstrate either deficiency of counsel's representation or prejudice. Moreover, Turner fails to address the district court's conclusion "that all of Turner's allegations regarding trial counsel's decisions involving jury instructions were inadequately pleaded, factually unsupported, or had been resolved substantively against Turner in the context of previous claims," or provide additional legal and factual support in his argument to us. We agree with the district court that Turner has failed to adequately plead, provide factual support for, or explain how these claims survive our review.

c. Deficient Closing Argument.

As his final example of ineffective assistance of counsel at the penalty phase, Turner claims that trial counsel made a number of errors during his closing argument, which a conscientious and diligent advocate would not have made, and which denied him due process of law. Without providing any legal authority for his argument, Turner asserts five specific errors: (1) "[c]onceding that his client had made damaging admissions, instead of focusing on the strengths of Turner's entitlement to a life sentence, which undercut Turner's defense and created a picture of a defense

attorney resigned to his client's receiving the ultimate punishment of death;" (2) "stating that the jury instructions given by the court did not define the obligations of the jury" and did not "hammer[ ] home the point that only if the aggravating circumstances outweighed the mitigating circumstances could the jury even consider death;" (3) delivering "many incomprehensible and ambiguous observations" and "fail[ing] to argue . . . that the offenses were committed while the defendant was under the influence of extreme mental or emotional disturbance;" (4) "fail[ing] to reiterate" that "Turner reasonably believed that he needed to repeatedly stab the victim to defend himself from the homosexual advances;" and (5) "fail[ing] to use Turner's age of 22 and his attempt at rehabilitation as mitigating circumstances."

The district court concluded that, while Mr. Ellery's closing argument may have omitted some potentially mitigating evidence, it demonstrated a reasonable trial strategy, as summarized below:

> Mr. Ellery's primary focus during his closing argument was that there were too many uncertainties in the circumstances of the offense for the jury to impose the death penalty. He reiterated that the reasonable doubt standard explained during the guilt proceedings referred to the jurors' moral certainty, but that when considering the death penalty, the jurors should be even more certain. He then catalogued the many uncertainties in the case: (1) because Turner took the television from the upstairs bedroom, without the companion remote, rather than the television downstairs, there was uncertainty as to whether Turner intended to commit a robbery before the fatal altercation with Mr. Savage; (2) because the coverings on Mr. Savage's body were different than those testified to by Turner, particularly the presence of a small pillow

under Mr. Savage's head that had no blood on it, there was uncertainty about whether someone entered the house after Mr. Savage was killed but before the Sheriff's investigation began; (3) because the evidence indicated someone may have entered the house after Mr. Savage was killed, there was uncertainty about whether Turner, or another person, cut the telephone cords and took the property said to be missing from Mr. Savage's home but never recovered; (4) because Turner made so many damaging admissions to Dr. Hamm, notably about stabbing Mr. Savage and returning to Mr. Savage's home after initially leaving, there was uncertainty about whether the jury should reject Turner's explanation of other events, notably that he stabbed Mr. Savage to ward off an unwanted sexual encounter; and (5) because of the indicia of Mr. Savage's homosexuality, there was uncertainty about whether the jury should reject Turner's story that his assaultive conduct was prompted by Mr. Savage's unwanted sexual advances.

While it may be true that another attorney may not have made the same strategic choices in closing argument, Turner offers no grounds for a conclusion that Mr. Ellery's chosen strategy was unreasonable and, therefore, not constitutionally sound. *See Strickland,* 466 U.S. at 689–90, 104 S.Ct. 2052.

██ Although Turner, with the benefit of hindsight, may have found ways in which Mr. Ellery could have done a better job, "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation. . . . The purpose is simply to ensure that criminal defendants receive a fair trial." *Id.* at 689, 104 S.Ct. 2052. Turner has not "overcome the presumption that, under the circumstances, the

challenged action might be considered sound trial strategy." *Id.* (internal quotations omitted). Thus, we conclude that Mr. Ellery's closing argument was not deficient.

## IV. Conclusion.

Turner asserts sufficient facts with respect to trial counsel's failure to investigate and present evidence of his long-term drug use and his abusive and difficult childhood, which, if true, could have altered the result of the penalty phase. Trial counsel failed to uncover potentially persuasive mitigating evidence, and thus Turner's penalty phase assistance may have been constitutionally ineffective. We therefore reverse the district court's denial of Turner's request for an evidentiary hearing on his claim that counsel was constitutionally ineffective for failing to investigate mitigating evidence during the penalty phase and affirm the district court's decision to deny Turner's petition for a writ of habeas corpus on all other issues. There is no reason to disturb the judgment of conviction.

AFFIRMED in part; REVERSED in part; and REMANDED.